O63AIntO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE INTERCEPT MEDIA, INC.,

                Plaintiff,

        v.                          24 Civ. 1515 (JSR)

OPEN AI, INC., MICROSOFT, *et al.*,

                                    Oral Argument

                Defendants.

------------------------------x

                                    New York, N.Y.
                                    June 3, 2024
                                    10:10 a.m.

Before:

                    HON. JED S. RAKOFF,

                                    District Judge

                        APPEARANCES

LOEVY & LOEVY
     Attorneys for Plaintiff
BY:  STEPHEN S. MATCH
     MATTHEW TOPIC

MORRISON & FOERSTER LLP
     Attorneys for Defendant OpenAI
BY:  JOSEPH C. GRATZ
     ERIC NIKOLAIDES

LATHAM & WATKINS LLP
     Attorneys for Defendant OpenAI
BY:  YIJUN ZHONG
     ALLISON L. STILLMAN

ORRICK, HERRINGTON & SUTCLIFFE LLP
     Attorneys for Defendant Microsoft
BY:  ANNETTE L. HURST
     CHRISTOPHER CARIELLO
     LISA T. SIMPSON
Also Present:
David Bralow

O63AIntO

1        (Case called)

2            MR. MATCH:  Good morning.  Stephen Match for The

3    Intercept.  With me I have Matt Topic, and David Bralow,

4    general counsel of The Intercept.

5            THE COURT:  Good morning.

6            MR. GRATZ:  Good morning, your Honor.  Joe Gratz for

7    Morrison Foerster for OpenAI.  With me are Eric Nikolaides from

8    Morrison Foerster, and Alli Stillman and Yijun Zhong from the

9    Latham Firm.

10           THE COURT:  Good morning.

11           MS. HURST:  Good morning, your Honor.  Annette Hurst

12   from Orrick, Herrington & Sutcliffe for Microsoft.  And with me

13   this morning are my colleagues Lisa Simpson and Chris Cariello.

14           THE COURT:  Good morning.  Were here on the motion to

15   dismiss.  Let me hear first from moving counsel.

16           MR. GRATZ:  Thank you, your Honor.

17           Your Honor, the plaintiffs here are apparently not

18   able to get ChatGPT to output their material.  And you would

19   think that would make them happy.  It certainly makes us happy.

20   That's not what ChatGPT is for, but it causes a problem for

21   their claim because it means they have not been injured in a

22   concrete way.

23           THE COURT:  Let's take a hypothetical.  So supposing

24   you're a reporter for a Chicago newspaper called the *Chicago*

25   *Examiner*.  Your name is Hildy Johnson.  And you're all too

O63AIntO

1    young to know what I'm talking about.

2            MR. GRATZ:  *The Front Page*, your Honor?

3            THE COURT:  You got it.  And you run an exclusive

4    interview with accused murderer Earl Williams.

5            MR. GRATZ:  Indeed.

6            THE COURT:  Fully copyright.  And now fast forward to

7    the present, and it's picked up, along with a million other

8    things, by ChatGPT.  And then you are a consumer and you go on

9    and you say, what would Earl Williams have to say if he were

10   asked to give his own account of why he committed the alleged

11   murder.  And out pops word for word the story that we've just

12   referred to, but without any copyright information, any

13   indication it came from the *Chicago Examiner*, etc.

14           If that were to occur, would you agree that would be a

15   violation?

16           MR. GRATZ:  So, your Honor, I want to add, I want to

17   add a fact to your hypothetical, which is the material that

18   popped out is copyright expression, copyrighted by the

19   newspaper.  Right?

20           THE COURT:  Right.

21           MR. GRATZ:  And I think in that case that might well

22   be a problem.  I think that might well be a problem for under a

23   number of theories.  It might be a copyright infringement

24   problem, to which there might be a fair use question attached.

25   There might be a number of issues.  But there might be, if

O63AIntO

1    there were all the elements there, if there were reason to

2    believe that that infringement was concealed beforehand, that

3    might well be a 1202 problem if you have the identical thing

4    coming out without -- and the only difference was it didn't

5    have the CMI attached.

6        THE COURT:  So your point, as I take it, is that they

7    haven't even come close to something like that, whereas,

8    theoretically, they could have inputted something into your

9    chat, and if out came their stories, they would have a claim.

10       MR. GRATZ:  Or at least they would be much closer to

11   having a claim, your Honor, yes.

12       THE COURT:  Okay.  So I know we want to go in order

13   here, but let me ask you to sit down for a minute, and we'll

14   come back to you very shortly.

15       MR. GRATZ:  Thank you, your Honor.

16       THE COURT:  But let me ask plaintiff's counsel, why

17   isn't that the problem?

18       MR. MATCH:  Good morning, your Honor.  It's not a

19   problem because 1202(b)(1) and 1202(b)(3) don't require there

20   to be an actual infringement or an actual concealment of an

21   infringement.  If we're talking about what we need to say to

22   state a claim as opposed to standing, which is where I think

23   Mr. Gratz was starting here, 1202(b)(1) requires that there be

24   a possible concealment of infringement in the future.  And

25   we --

O63AIntO

```
 1              THE COURT:  How do you know for starters, because I'm
 2    not sure I saw it in your complaint other than in conclusory
 3    fashion, that they even copied your stuff?
 4              MR. MATCH:  So we've alleged that there are recreated
 5    approximations of their training sets and that those training
 6    sets contain --
 7              THE COURT:  Recreated proximations?
 8              MR. MATCH:  Approximations, yes.
 9              THE COURT:  What the heck are they?
10              MR. MATCH:  I have to go outside the complaint to
11    describe this, but they are --
12              THE COURT:  Well --
13              MR. MATCH:  If you want me to stay within -- we
14    haven't described them in detail in the complaint.
15              THE COURT:  So what am I to make of something you
16    haven't specified?
17              MR. MATCH:  I think we've alleged plausibly that there
18    are these approximations created by third parties of their
19    training sets that contain our articles in them.
20              THE COURT:  You may have alleged that, but if you
21    haven't alleged that -- where do you allege that the
22    approximate ones show that your stuff was copied?
23              MR. MATCH:  I'm sorry, that our stuff is copyrighted?
24              THE COURT:  No.  It has been --
25              MR. MATCH:  Copied.
```

O63AIntO

1        THE COURT:  -- copied by them.

2        MR. MATCH:  That would be paragraph 38.

3        THE COURT:  Hold on a minute.  Paragraph 38.

4        "Various sources," p.s. unnamed, "have recreated

5    approximations of the Common Crawl and WebText training sets

6    based on publicly available information discussing the

7    methodologies used to create them.  Those sources have made

8    these recreated data sets, or instructions on how to derive

9    them, available on the internet.  Thousands of plaintiff's

10   works are contained in the recreated versions of these data

11   sets without the author, title, copyright notice, and terms of

12   use infringement found in plaintiff's original publications."

13       So if I were to give you leave to amend, what would

14   you add to that paragraph?

15       MR. MATCH:  So if you were to give us leave to amend,

16   we would explain with more detail about what these

17   approximations were and how they were derived.  If you want I

18   can say it now without --

19       THE COURT:  Absolutely.

20       MR. MATCH:  Sure.  There are a couple of different

21   ones.  There's one called C4.  C4 is a training set that was

22   used for Google's own AI model, another large language model,

23   kind of like ChatGPT.  It was created from the same overall

24   corpus that some of OpenAI's training sets were created from.

25   That's called Common Crawl, which we've identified in this

O63AIntO

1    paragraph.

2         And we do allege this in the complaint that we

3    employed a data scientist to analyze the C4 data set.  And the

4    C4 data set contains 2,753 Intercept articles.  And he was able

5    to write a script that has identified for each article exactly

6    what type of copyright management information was removed from

7    it.  And in --

8         THE COURT:  So let me stop you there.

9         MR. MATCH:  Yes.

10         THE COURT:  So assuming for the sake of argument that

11    that's what was done by the defendants here, the equivalent of

12    what you've just described.  Are you saying that their mere

13    input of those into their database is a violation, or do you

14    contend that the result was that the output would be a

15    violation?

16         MR. MATCH:  So, both.  So the copying into the

17    database, sort of the initial copying into the database, if it

18    could be like an infringement of copyright under Section 106,

19    we haven't brought an infringement claim here because our works

20    aren't registered with the Copyright Office.  That's not

21    required for a 1202 claim, which is the claim we're bringing

22    here.  So the copying of the articles and the removal of the

23    copyright management information is a violation of 1202(b)(1).

24         THE COURT:  Why is your stuff not copyright?

25         MR. MATCH:  Well, we own copyright to it.

O63AIntO

| | |
|---|---|
| 1 | THE COURT:  I understand that.  But I mean why is it |
| 2 | not registered? |
| 3 | MR. MATCH:  It hasn't been registered because unlike |
| 4 | for print publications, there's no sort of -- it's economically |
| 5 | just very expensive to register copyrights in online only |
| 6 | publications because there's no ability to bulk register them. |
| 7 | So that's why, I mean, I think very few, if any, online only |
| 8 | establishers have registered their online news articles with a |
| 9 | Copyright Office.  Unlike, you know, more legacy media that |
| 10 | also has a print version that can bulk register their works. |
| 11 | So that's why it's not registered. |
| 12 | THE COURT:  So I cut you off sort of midstream.  You |
| 13 | were saying it's both the violation under both the input and |
| 14 | the output, and what about the output aspect? |
| 15 | MR. MATCH:  So, the output, if our works are conveyed |
| 16 | to the public, without copyright management information, that |
| 17 | would be a violation. |
| 18 | THE COURT:  Yes.  But supposing like it's a paragraph |
| 19 | here or a paragraph there, still a violation? |
| 20 | MR. MATCH:  Well, I mean there's -- this isn't an |
| 21 | issue that really has been briefed in a lot of detail.  There |
| 22 | has been cases holding that excerpts produced without CMI can |
| 23 | constitute a violation.  Now, I recognize that there has to be |
| 24 | a somewhat close to an identical match between the original |
| 25 | article and the copied version without CMI under (b)(3).  But |

O63AIntO

```
1    if we're talking about the scienter element common to both, you
2    know, knowledge that an infringement will be concealed, which
3    relates to the removal claim as well, that doesn't have to be
4    an identical copy because infringement itself doesn't require
5    anything like an identical reproduction.  It could be a large
6    amount of text.  I mean, there you have to get into fair use.
7    But for the scienter element, concealment of an infringement,
8    that doesn't have to be an identical copy.
9              THE COURT:  So what stopped you from just putting
10   questions into the defendant's product and seeing if what came
11   out was your stuff?
12             MR. MATCH:  So, this is not the first of these cases
13   that's been filed against the defendants.  In the New York
14   Times case, they had regurgitations of their works.  They put
15   them in the complaint, and they were accused by OpenAI of
16   hacking their products.
17             So we don't believe that we had to do that in this
18   case, both for purposes of (b)(1) -- I'm sorry, 12(b)(6) motion
19   and purposes of standing.  If the Court concludes that that's
20   required, I would request permission to replead those facts and
21   try to do that.  But we haven't done that because of the
22   accusations that OpenAI made against New York Times in its
23   case.
24             THE COURT:  Okay.  Let's go back to defense counsel.
25   We'll come back to plaintiff's counsel in a minute.
```

O63AIntO

1    So, first of all, anything you wanted to say just in

2   response to what was just said by plaintiff's counsel?

3    MR. GRATZ:  Only, your Honor, that we heard a lot of

4   "if" and a lot of "it's possible."  And the *CoreLogic* case from

5   Judge Berzon addresses how you think about those issues in the

6   context of this statute in way that I think sort of resolves

7   why this complaint doesn't.

8    THE COURT:  So am I right that your training sets are

9   kept secret?

10    MR. GRATZ:  That is correct.  We do not make all of

11   our training sets public.

12    THE COURT:  And so how is any plaintiff who believes

13   you have violated the relevant statutes going to be able to

14   plead, if other than by using say analogous training sets or

15   other expert material or whatever, as they allege they've done

16   here?

17    MR. GRATZ:  The answer is if it never comes out, none

18   of them have a claim.  And they can see whether or not it comes

19   out.

20    THE COURT:  And they can see by putting in their

21   own --

22    MR. GRATZ:  They can, they can --

23    THE COURT:  So why shouldn't I give him, give the

24   plaintiffs -- plaintiff, who I guess is her.  Right?  Plaintiff

25   is -- no, it's it.

O63AIntO

1          MR. GRATZ:  It.

2          THE COURT:  Or these days we would say they.  Why

3     shouldn't I give the plaintiff an opportunity to replead to see

4     if they can do that?

5          MR. GRATZ:  Well, I think the first thing I would say

6     is they've made no proffer that they would be able to.  What

7     they've said is well, you know -- and they have not told us

8     whether or not they tried and were unable to.

9          What they have said is, well, *The Times* did what they

10    did and you said what they did broke the rules and was

11    inappropriate, and so we didn't try and do anything.  They

12    should have tried to sweet talk ChatGPT into doing something it

13    wasn't designed to do to see whether they had a claim here.  We

14    don't think they're going to be able to and they've made no

15    proffer that they're able to.  And, you know, we have -- you

16    can get to this from your phone.  This isn't a hidden or

17    difficult thing.

18         And so I think the answer is they haven't made a

19    proffer of what would happen if they got leave to do that.  And

20    I think, in fact, they just haven't been -- we heard they have

21    a data scientist.  They haven't been able to do it.

22         THE COURT:  So I come back, since your argument in

23    substantial part is they haven't done that, they therefore,

24    haven't alleged any actual injury, therefore they both lack

25    standing and can't make a claim.  And given the thrust of the

O63AIntO

1   federal rules for free leave to amend, why shouldn't I give

2   them say two weeks to give it a shot?

3          MR. GRATZ:  We think that is within your power.  We

4   don't think they've made a proffer that like necessarily

5   justifies it, but we recognize it's within your Honor's power

6   to do so, and we can be back here arguing about whatever other

7   issues arise out of whatever they find or don't find.

8          THE COURT:  And think how much more you could bill

9   your clients.  We'll disregard that.

10         Let's go back to plaintiff's counsel.  Assuming for

11  the sake of argument I give you two weeks to amend in the

12  fashion I've just indicated and you've tried, fail.  You can't

13  get anything that's remotely your stories out of the stuff, is

14  that the end of your lawsuit?

15         MR. MATCH:  No.  And I want to take that both from the

16  perspective of standing and from the perspective of the

17  elements of the claim.  So on standing, the issue is really

18  whether we've alleged a concrete injury and whether

19  dissemination of our works is required for that.

20         The *TransUnion* framework is the applicable framework

21  here, which requires us to identify a historical analogue to

22  our injury.  I think we don't need to identify an exact

23  duplicate.  And I think the Second Circuit's decision in *Saba*

24  *Cap. v. Nuveen* provides a helpful starting point for how close

25  that analogy has to be.  It found sufficiently analogous an

O63AIntO

1    analogy between trespass to channels and interference with

2    voting rights in an investment fund, solely because they both

3    involved something analogous to a property-based injury.  And

4    that's essentially what we're identifying as the relevant

5    injury for purposes of standing, which is a property-based

6    injury analogous to copyright infringement.

7            So infringements don't require dissemination.  We

8    briefed this, and they haven't disputed it.  So if copyright

9    infringement is the relevant analogy, then I think we've

10   satisfied the concreteness requirement even if we haven't

11   identified any dissemination.  Why is it a close analogy?  It's

12   a close analogy because I think in typical cases, violations

13   of --

14           THE COURT:  How are you injured, assuming your

15   premise, which is that they're copying, period, regardless of

16   whether they then disseminated is a violation; how are you

17   injured by that fact?

18           MR. MATCH:  The injury is the interference with our

19   property.  And that has been recognized as an injury since --

20           THE COURT:  Well, I know those cases in the copyright

21   context.  What's your damages?

22           MR. MATCH:  So in this case we're seeking statutory

23   damages primarily, which is provided by the DMCA.  It's also

24   provided by the Copyright Act, which Congress did because it

25   recognized that actual damages can be very difficult to prove

O63AIntO

```
 1   in these sorts of cases.  So that's primarily what we're
 2   seeking here.
 3            THE COURT:  Okay.  Let me go back.  I'm sorry to go
 4   back and forth.
 5            MR. MATCH:  No problem.
 6            THE COURT:  It's more helpful for me to do it this
 7   way.
 8            MR. GRATZ:  And, your Honor, Ms. Hurst will address
 9   this line.
10            THE COURT:  Okay.  Very good.  Thank you.
11            So supposing, hypothetically, an unquestionably
12   copyrighted work is fed into your database but never
13   disseminated, why isn't that nevertheless a violation?
14            MS. HURST:  Your Honor, it's clear that the
15   attribution right is not part of the historical tradition of
16   copyright in the United States.  And we can see this, your
17   Honor, because the right of attribution did not come into the
18   Copyright Act until the 1990 enactment of Section 106A in the
19   Visual Artists Rights Act.
20            And for all the years prior to that, your Honor, not
21   only was the right of attribution not part of the U.S.
22   Copyright Act, but the U.S. had refused on a number of
23   occasions to exceed to The Berne Convention and the provisions
24   that included the right of attribution and the right of
25   integrity.
```

O63AIntO

1          Your Honor, the Second Circuit describes the fact that

2     moral rights, droit moral from the French tradition, are not

3     part of the Copyright Act in the *Gilliam* case.  And there's

4     also an extensive tracing of this history in a report issued by

5     the Copyright Office in 2016, your Honor.  And let me just give

6     the Court --

7          THE COURT:  2016, oh, yeah, just shortly before my

8     birth.

9          MS. HURST:  Apologies, your Honor.  It's 2019

10    actually, your Honor, and that report is available on the

11    Copyright Office website.  It's a report from the register

12    Karyn Temple entitled *Authors, Attribution, and Integrity:*

13    *Examining Moral Rights in the United States*.

14         And, your Honor, it's really clear that the right of

15    attribution, which is what CMI protects, just isn't part of the

16    historical tradition of protection of economic rights for

17    copyright.  And indeed, it really excludes the possibility of

18    treating that as closely analogous to a copyright interest

19    because it has never been so.  And even now, your Honor,

20    there's only a very limited right of attribution in Section

21    106A.

22         So the CMI protects this attribution, a voluntary

23    attribution that people can apply by putting CMI on it, but it

24    is that interest in personality or the right to be associated

25    with the work that is protected.  And that is what has to be

O63AIntO

1  harmed here, your Honor, in order for them to have a

2  sufficiently concrete injury under 12(b)(1).

3       Without dissemination, your Honor, that interest in

4  personality simply cannot be harmed in the way that is required

5  by *TransUnion*.  And those were really the facts in *TransUnion*,

6  your Honor, where the Court made a distinction between those in

7  the class who had been able to show dissemination, and those in

8  the class who had not.

9       So, your Honor, because moral rights are not part of

10  the U.S. copyright tradition, the right of attribution is

11  limited to dissemination.  Without outputs, your Honor, they

12  cannot plead the harm that is required to meet the 12(b)(1)

13  standard.  And, your Honor, I would just note that the words

14  "harm" or "injury" do not appear anywhere in this complaint.

15  There is presently no theory of harm in this complaint.

16       THE COURT:  What do you say to the argument that

17  Congress in this area has traditionally recognized that copying

18  is itself a harm and that's why they put in statutory damages

19  because often you can't prove any other harm?

20       MS. HURST:  That is correct, your Honor.  And the

21  answer to that is to bring a claim under the Copyright Act with

22  the intended restrictions and limitations on that claim, the

23  Section 1202 claim was not meant to supplant those restrictions

24  and limitations.  And indeed, the scheme there requires injury

25  as a statutory matter in Section 1203 that is not part of

O63AIntO

```
1   Section 501, in the main part of the Copyright Act, your Honor.

2              So there's a clear distinction and congress recognized

3   that limitation as part of the DMCA, whereas it has not

4   previously recognized that limitation as part of Section 501 or

5   Section 504.

6              THE COURT:  Okay.  Let me hear from plaintiffs on this

7   issue.

8              MR. MATCH:  So the DMCA is not fundamentally about

9   attribution.  The strategy that Ms. Hurst is employing here is

10  to suggest that the appropriate analogy that the Court needs to

11  consider here is between the DMCA on the one hand and a

12  nonexistent attribution right on the other.  According to

13  TransUnion, though, the question is whether the plaintiff has

14  identified a close historical analogue.

15             So there was a question about whether we get to pick

16  our analogy.  We do under TransUnion.  Of course the Court has

17  to decide whether it's close enough.  But I just want to point

18  out why attribution is not a particularly close analogy here.

19  There's a number of reasons.

20             Let's start with the report that Ms. Hurst mentioned

21  from the Copyright Office.  I agree that that report says that

22  attribution is not part of the sort of tradition of copyright

23  in this country.  That report though -- I mean as she pointed

24  out, Section 106A, the Visual Artists Rights Act, expressly

25  mentions attribution in the text.
```

O63AIntO

1          The DMCA says nothing about attribution.  You would

2     think that if the DMCA were about attribution, it would require

3     attribution.  But it doesn't.  The DMCA does not require

4     anybody to put any CMI on any work.  It allows you, if you want

5     to put CMI in the work, you can do that, but you don't have to

6     put the author on.  You can give plenty of information that

7     qualifies as copyright management information that is not

8     attributed, such as the title of the work, that doesn't

9     attribute the work to anybody.

10          The page 98 of the report that Ms. Hurst mentioned,

11     contains a recommendation from the Copyright Office that

12     Congress amend Section 1202 to add a new section that would be

13     identical to the present version of the statute.  Except that

14     it replaces the current scienter element with one that says,

15     you know, with knowledge that the work wouldn't be attributed.

16          And attribution, I think if that were really the point

17     of the DMCA would -- it's hard to see how Section 1202(b)(1)

18     would even further that purpose at all given that we have

19     Section 1202(b)(3), which requires distribution.  (b)(1)

20     doesn't.  It can be satisfied by removal.

21          So the point is the defendants want the Court to sort

22     of ask whether attribution is the right analogy and find that

23     it's not satisfied because there's no dissemination.  But the

24     point is copyright infringement is a close analogy and it

25     doesn't require dissemination.  I would like to point out that

O63AIntO

infringement will often be the way by which someone violates

1202(b)(1) and 1202(b)(3).  So one way to violate (b)(1) is by

creating a copy of a work that has CMI on it, making a copy of

the work, and not including CMI on the copy.  A citation for

that is *Associated Press v. All Headline News Corp*, which we

cite in our brief.

        So that will violate (b)(1) assuming the scienter

elements are met.  But it will also violate at least prima

facie the exclusive right to reproduction under Section 106.

Ditto for (b)(3).  (b)(3) requires distribution of a copyright

protected work, which is also one of the exclusive rights under

Section 106.  In fact, I think the (b)(3) claim, which we

haven't discussed a lot today, even satisfies their theory of

standing at least as requiring dissemination, because by

definition a distribution is a dissemination of the work.

        So the point I want to drive home is that copyright

infringement is a close analogy that DMCA, they both involve

tampering with copyright protected works.  Even on a (b)(1)

claim, even if it's not done by actual copyright infringement,

it's at least close to it because you're taking off information

that's conveyed very close to the work.  In the case of a news

article, maybe you're removing the headline, which is what we

alleged.  The headline, although it's not copyrighted, it

conveys meaning that is central to the meaning of the actual

work.  I think common experience shows that when you read a

O63AIntO

| | |
|---|---|
| 1 | news article, you're sort of colored by the headlines.  So |
| 2 | that's analogous to copyright infringement.  It doesn't have to |
| 3 | be infringement.  *TransUnion* was very clear that it doesn't |
| 4 | have to be exact duplicate.  It's close and that's what we need |
| 5 | to allege standing. |
| 6 | THE COURT:  All right. |
| 7 | MR. MATCH:  Sorry. |
| 8 | THE COURT:  No, you can sit down.  The parties have |
| 9 | addressed all of the questions that I had.  But let me give |
| 10 | each side an opportunity to add anything else they wanted to |
| 11 | add before we conclude the argument. |
| 12 | MS. HURST:  Your Honor, briefly, I would just add on |
| 13 | behalf of Microsoft that this whole discussion is even more |
| 14 | theoretical because there's no theory in this complaint of how |
| 15 | there could be any infringement resulting from any act |
| 16 | allegedly taken by Microsoft.  And that's important because |
| 17 | even for 1202(b)(1), it's not just removal in the abstract, |
| 18 | your Honor.  It's removal with the ultimate aim of facilitating |
| 19 | some infringement.  And putting aside the propriety of |
| 20 | analyzing scienter on a Rule 12(b) motion, your Honor, first |
| 21 | let's just go to the objective thing that is required, which is |
| 22 | some theory of infringement.  And then there are these layers |
| 23 | of scienter around that, your Honor.  But the Court doesn't |
| 24 | even have to look at those layers of scienter and whether the |
| 25 | allegations are sufficient, because there's no theory of |

O63AIntO

| | |
|---|---|
| 1 | ultimate infringement identified that is furthered by the |
| 2 | alleged acts.  And for OpenAI's ChatGPT product, there's no |
| 3 | causation related -- between the removal of CMI for either |
| 4 | OpenAI or Microsoft, and any theory of infringement here, your |
| 5 | Honor. |
| 6 | So while we're skeptical that any amendment can cure |
| 7 | all of these problems, I did want to underscore, your Honor, |
| 8 | the degree of remoteness that is really presented here by the |
| 9 | allegations against Microsoft. |
| 10 | THE COURT:  Thank you. |
| 11 | Anything further from plaintiff's counsel? |
| 12 | MR. MATCH:  Yes, your Honor.  I would just like to |
| 13 | touch on this issue as well.  Our allegations of infringement |
| 14 | or infringement theory are contained in paragraphs 47 to 50. |
| 15 | And there's really a couple of different types of infringement. |
| 16 | So, first of all, it's not just inducing, enabling, or |
| 17 | facilitating infringement, which is one type of infringement -- |
| 18 | or scienter. |
| 19 | There's also the concealment.  So our theory, one of |
| 20 | our theories of infringement, is that they infringe by two |
| 21 | things.  One is copying the articles in the first place and the |
| 22 | second is regurgitation.  So they know that removing CMI, I |
| 23 | think, would conceal from ChatGPT users that they infringed |
| 24 | copyright by both copying and regurgitation. |
| 25 | Now, of course we don't allege actual dissemination of |

O63AIntO

```
 1   our works, but it's important to keep in mind and I think the

 2   Court touched on this, we can try to do that if the Court

 3   believes that that's required, but we don't need to actually

 4   allege actual dissemination of our articles because concealment

 5   only has to be likely from an ex ante perspective when they

 6   remove the CMI.  And we've alleged that it's likely here for a

 7   couple of reasons.

 8           One is we've alleged the prevalence of our works in

 9   their training sets, there's thousands of them.  One thing I

10   forgot to mention before is that if the Court is wondering

11   about how many articles are there, we put it in our brief.

12   OpenAI has admitted that in earlier versions of the training

13   set contains exactly 6,484 of our articles.  So there is no

14   dispute, no reasonable dispute at least at the pleading stage

15   if we were to amend that our articles are in there.  They've

16   admitted it.

17           The other is that according to a study that we cited

18   in the complaint, 45 percent of the ChatGPT responses contains

19   material identical to preexisting texts.  So ChatGPT is a

20   serial plagiarizer and it has a lot of our works to plagiarize.

21   And I think those two facts put together make it likely that ex

22   ante that our works would be regurgitated in whole or in part,

23   and that would conceal from ChatGPT users --

24           THE COURT:  Well, I will put the question that your

25   adversary in effect invited me to put.  Have you tried yourself
```

O63AIntO

1   in preparation for this lawsuit to see if that's true?

2           MR. MATCH:  No.  Like I said, we didn't do that

3   deliberately because -- yeah.

4           THE COURT:  Whether it was deliberate or not.

5           MR. MATCH:  Sure.  We didn't do it.

6           THE COURT:  I just wanted to know whether you did it

7   or not.

8           MR. MATCH:  No.  So, or at least I don't believe we

9   did.  And the other type of -- I'm sorry.  I'm lost here.

10          THE COURT:  No, no.  How old are you?

11          MR. MATCH:  Thirty-four.

12          THE COURT:  You don't lose your memory until you're my

13  age.  Now come on.  Go ahead.

14          MR. MATCH:  Actually, I should say I don't think that

15  we attempted to do that.  There may have been like one or two

16  very small prompts that we did at a very early stage that we

17  didn't decide to pursue.  I honestly don't fully remember.  But

18  there were certainly no -- our data scientist who's the expert

19  never tried to do that.

20          THE COURT:  Okay, well.

21          MR. MATCH:  But I also wanted to point out that

22  defendants -- there's a second theory of infringement, which is

23  infringement by users.  So if it's a likely ex ante that our

24  works would be regurgitated, whether or not they actually have

25  been, then they have reason to know that ChatGPT users would

O63AIntO

| 1 | further disseminate those works, and that's because the

| 2 | defendants promote ChatGPT as a -- I'm sorry, as a tool to

| 3 | generate content for a future audience.

| 4 |     And I think it's at least plausible that the existence

| 5 | of CMI on a regurgitation, which wouldn't be there because the

| 6 | CMI is removed from the training data, would at least be a

| 7 | deterrent to future copying by ChatGPT users.

| 8 |     I think all the Court needs to assume for those

| 9 | purposes is that users respect the law, either because they

| 10 | have some inherent regard for it or because they don't want to

| 11 | be liable for copyright infringement.  That's all that I think

| 12 | the Court needs to assume to find that theory of infringement

| 13 | at least plausible enough.  I would stress in discovery that

| 14 | they have the prompts, I assume, in their databases, at least

| 15 | for some users, and so that can be explored through discovery.

| 16 |     THE COURT:  All right.  I can see that defense counsel

| 17 | is itching to say some final words, but he has the burden of

| 18 | proof, so I will hear from defense counsel.  I admire your

| 19 | restraint in only indicating by your body language that you

| 20 | wanted to be heard as opposed to standing up and saying I want

| 21 | to be heard.

| 22 |     MR. GRATZ:  Thank you, your Honor.  I will be

| 23 | extremely brief.

| 24 |     We heard that this might have happened to someone else

| 25 | and that is not particularized harm.  That is exactly what the

O63AIntO

| | |
|---|---|
| 1 | situation in *TransUnion*.  If someone else's content were |
| 2 | outputted, that does not create a harm and does not show a |
| 3 | likelihood of harm for the plaintiff. |
| 4 | The other thing that we heard that I want to just |
| 5 | respond to briefly is that their theory on the second scienter |
| 6 | element is that we should have known that this would conceal |
| 7 | infringement.  And the question is just conceal what, from |
| 8 | whom, resulting in what harm to them?  Right? |
| 9 | THE COURT:  You're saying it involves many speculative |
| 10 | steps? |
| 11 | MR. GRATZ:  And the biggest speculative step in the |
| 12 | middle is that their stuff comes out of ChatGPT.  The issue we |
| 13 | have been talking about, and I think now we heard, well, they |
| 14 | tried a little, and it wasn't going well and -- |
| 15 | THE COURT:  I don't know we heard that.  His memory |
| 16 | was uncertain on that. |
| 17 | MR. GRATZ:  Yeah.  Well, we may well find out. |
| 18 | THE COURT:  All right.  Although you are hoping you |
| 19 | won't because you're hoping you'll win the motion. |
| 20 | MR. GRATZ:  Indeed, your Honor.  We hope not to find |
| 21 | out. |
| 22 | THE COURT:  All right.  Well, I thank all counsel for |
| 23 | their excellent arguments. |
| 24 | As I'm sure you're all aware, a requirement for being |
| 25 | a federal judge is that you be technologically incompetent, and |

O63AIntO

1    I am fully qualified.  So it will take me a little while to get

2    through this.  But I will certainly get you a bottom line order

3    at least by two weeks from now.  Whether it will be a full

4    opinion, it might just be an order with leave to amend, under

5    many possibilities.  I don't know.  But at least you'll know

6    where things stand two weeks from today.

7             So, again, my thanks.  This concludes the proceeding.

8             (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25